# In the United States Court of Federal Claims

No. 22-61
(Filed under Seal:  August 26, 2022)
(Reissued for Publication: September 8, 2022)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ALISUD - GESAC HANDLING – SERVISAIR 2 SCARL *also known as* ALGESE 2 SCARL *also known as* ALGESE | |
| Plaintiff, | |
| v. | Material Misrepresentation, Labor Unrest, Past Performance Evaluation, Responsibility, Technical Evaluation, Motion to Dismiss, MJAR |
| THE UNITED STATES, | |
| Defendant. | |
| and | |
| LOUIS BERGER AIRCRAFT SERVICES, INC. | |
| Defendant-Intervenors. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

**DAMICH**, Senior Judge

On January 19, 2022, Plaintiff Algese ("Plaintiff"), filed a post-award bid protest challenging the United States Government's ("Government") award to Defendant-Intervenor Louis Berger Aircraft Services, Inc. ("LBAS").  The bid protest concerns two contracts reflecting request for proposals ("RFPs") N68171-20R-0014 (the "Naples Contract") and N68171-21R-6001 (the "Rota Contract").  These contract awards were issued by the Department of the Navy's

---

[1] This reissued Opinion and Order incorporated the agree-to redactions proposed b the parties.  The redactions are indicated with "XXXXX."

Fleet Logistics Center (the "Navy" or the "Agency") for air terminal and ground handling services at two Navy airfields, respectively located in Rota, Spain and Naples, Italy.

ASvi155LBAS is the incumbent for the Rota contract, which it has held since 2015. Algese is the incumbent for the Naples contract, which it has held since 1981. Relevant to this bid protest, Algese alleges that LBAS's bids for the Rota and Naples contracts were misleading and reflected material misrepresentations because LBAS's Past Performance submissions did not acknowledge that LBAS faced labor unrest and a number of workforce reduction-related lawsuits in Spanish courts stemming from its post-2015 management of the Rota airfield.

On January 25, 2022, the Government requested that Algese's bid protest be remanded to the Navy in lieu of four Spanish court judgments against LBAS, "to reconsider the award decisions" for the Rota and Naples contracts. ECF No. 21. On January 28, 2022, this Court granted the Government's Motion to remand to the Navy. ECF No. 27. On May 2, 2022, the Navy submitted the result of its review, which concluded that award of both the Rota and Naples contracts should properly remain with LBAS. ECF No. 31. On May 20, 2022, Algese filed an Amended Complaint to proceed with challenging both contract awards to LBAS. ECF No. 35. On June 29, 2022, Algese filed a Motion for Judgment on the Administrative Record. ECF No. 41. On August 3, 2022, the Government filed a Cross-Motion for Judgment on the Administrative Record, including a Motion to Dismiss the Rota portion of Algese's bid protest. Also on August 3, 2022, LBAS filed a Cross-Motion and Response to Algese's Motion. ECF No. 45. On August 17, 2022, Algese filed a Response to the Government and LBAS. ECF No. 46. On August 24, 2022, the Government and LBAS both filed a Reply to Algese's Response. ECF No.'s 53-54.

The Government presents two arguments supporting its Motion to Dismiss Algese's protest of the Rota RFP (exclusively). First, the Government contends that Algese was fundamentally ineligible for award of the Rota RFP because it was a foreign contractor without a facilities clearance. However, the Government's position is undermined in part by the fact that it made representations to Algese about these clearance matters being addressed *after* rather than *before* award. Second, the Government also argues that Algese lacks standing because it did not even finish second in the bidding for the Rota RFP. However, Algese's arguments, if proven on the merits, would very likely move it into second place in line behind LBAS for award of the Rota RFP. The Government may not contend that a Plaintiff must prove the merits of its case in order to establish standing – therefore, questions about which bidder would have finished second cannot be the basis for granting the Government's Motion to Dismiss.

Nevertheless, the Government's Cross-Motion for Judgment on the Administrative Record succeeds with respect to both the Rota and Naples RFPs. Concerning the Rota RFP, Algese's case primarily turns on the emphasis of labor unrest at the Rota airbase and related Spanish Court cases. Algese alleges that LBAS materially misrepresented its Past Performance reference for its incumbent performance at the Rota airbase by omitting information about labor unrest and related Spanish Court cases, and also that the unrest should have induced the Navy to downgrade LBAS, or to make adverse responsibility findings. However, the Navy was already well aware of the labor unrest, found that it did not impact LBAS's performance at Rota, and

even considered and then *declined* to add a "labor relations" evaluation category to the next (current) Rota solicitation.  The Navy also rationally found that the Spanish court cases stemming from the unrest represented differences in national values between Spain and the United States – the cases reflected routine process in Spain, not poor business ethics or disregard for legal rights on the part of LBAS.  Furthermore, the Spanish Ministry of Defense reportedly considered disqualifying LBAS, and then issued an affirmative approval of LBAS's eligibility for the Rota RFP.  The Court holds that the Navy rationally considered the labor unrest at Rota during the bidding process.  Accordingly, given the Navy's familiarity with the labor unrest, the Court additionally holds that LBAS's failure to discuss the unrest in its Past Performance submission does not constitute a material misrepresentation and did not taint the bidding process. The Court further holds that the Navy rationally found that the Spanish court cases stemming from the unrest did not materially undermine LBAS's bid.  Finally and separately, the Navy's finding that Algese's technical proposal was "unacceptable" was also rational.

Concerning the Naples RFP, Algese's arguments against award to LBAS are preponderantly a response to LBAS submitting its incumbent performance at Rota as a Past Performance reference (again without acknowledging labor unrest or Spanish court cases).  Thus, Algese makes many of the same labor unrest-related arguments and asserts that the labor unrest at Rota will repeat at Naples.  These arguments fall short for the same reasons that they are insufficient to contest the Navy awarding the Rota RFP to LBAS.

Beyond the labor unrest arguments, Algese further challenges award of the Naples RFP to LBAS by contending that the Navy (1) irrationally waived for LBAS the suggestion that bidders submit Past Performance references for other entities involved in teaming arrangement proposals and (2) that the Navy irrationally evaluated (overrated) LBAS's technical proposal (staffing plan).  However, the entity ostensibly collaborating with LBAS was its own affiliate, and the Navy's evaluation of LBAS's staffing plan – owed significant deference by this Court – was irrational.

Therefore, after careful consideration, and for the reasons set forth below, the Court **DENIES** Defendant's Motion to Dismiss with respect to the Rota RFP.  The Court further **DENIES** Plaintiff's Motion for Judgment on the Administrative Record.  The Court **GRANTS** Defendant's Cross-Motion for Judgement on the Administrative Record.  The Court further **GRANTS** Defendant-Intervenor LBAS's Cross Motion for Judgment on the Administrative Record.

## I.  Standard of Review

### A.  Standard for Motion for Judgment on The Administrative Record

This Court decides a motion for judgment upon the administrative record pursuant to Rule of the Court of Federal Claims ("RCFC") 52.1.  The Court determines whether "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).  "[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record." *Id*. at 1356.

**B.  Standard of Review for Motions to Dismiss under RCFC 12(b)(1)**

In addressing a RCFC 12(b)(1) motion, "determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1464 (Fed. Cir. 1997) (citations omitted). The Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). However, the Court is not restricted to the face of the pleadings and may consider evidentiary matters outside the pleadings. *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993).

**C.  Bid Protest Standard of Review**

In a bid protest, the trial court "review[s] the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  An APA challenge requires showing that the agency action in question is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Accordingly, "[a] bid award may be set aside" if (1) "the procurement official's decision lacked a rational basis" or (2) "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa*, 238 F.3d at 1332).  The APA also requires that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.  So, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *WellPoint*, 953 F.3d at 1377 (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also Bannum*, 404 F.3d at 1351.

In reviewing the agency's procurement decisions, the Court does not substitute its judgment for that of the agency.  *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations.").  The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues confronting [her]." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations and quotes omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see also Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333. But "that explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (*citing Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)).

The Court's "highly deferential" review such that "the disappointed offeror bears a 'heavy burden' of showing that the award decision 'had no rational basis' is particularly the case with respect to matters requiring technical judgment. *See, e.g., Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 740 (2007) ("Agencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment."); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) ("the minutiae of the procurement process . . . involve discretionary determinations of procurement officials that a court will not second guess.") (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). The protester's mere disagreement with the agency's assessment is not "nearly enough" to demonstrate arbitrary and capricious agency action. *See CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717-18 (2012).

## II.    The Two Contracts – Rota and Naples

The issue at the heart of this bid protest concerns LBAS's incumbent performance of the Rota contract (awarded in 2015), which LBAS cited in its Past Performance representations in its bid for retaining the Rota contract and securing the Naples contract.

With the Rota RFP, Algese was disqualified from contention at an early stage because the Navy did not accept Algese's technical proposal; however, the Navy's Rota award decision implied that even if Algese's technical proposal had been found acceptable, this would not have changed the award decision because LBAS's price was lower Algese's. In other words, with the Rota RFP, overturning Algese's rejected technical proposal would not change the result because this would simply repeat the circumstances of the Rota RFP – LBAS would still be selected over Algese for award because LBAS's bid had a lower price.

The Naples RFP was a Best Value solicitation in which LBAS and Algese effectively tied aside from price, leading the Navy to select LBAS for award because its bid price was lower. AR 1999.

In short, Algese's primary challenge to the Rota and Naples awards to LBAS hinges on LBAS's Past Performance representations concerning the incumbent Rota contract – LBAS's submissions did not mention that reductions in the Rota airfield workforce led to local labor disputes, leading to a number of lawsuits against LBAS in Spanish courts.

### A.  The Rota RFP – Background and Award to LBAS

#### i.    Background

The Rota RFP featured a three-step structure for selecting an awardee. Step 1A involved an evaluation of the baseline acceptability of the Offeror on a pass-fail basis. AR 5850. Offers were to be deemed acceptable (to "pass") when they assented to the terms and conditions of the RFP. *Id.* Step 1B reflected an Evaluation of Cooperation Compliance with Spanish authorities; the Navy would forward a list of potential contractors to the Spanish government (Ministry of Defense), which had the option of disapproving a contractor for "reasons of security or due to the

contractor's prior misconduct with the Spanish armed forces," disqualifying such an Offeror from award. *Id.* Step 1C, Evaluation of Non-Price Factors, required the Navy to evaluate proposals under two factors: (I) Technical Capability, and (II) Past Performance (with Factor III, Price, to follow in Step 2). *Id.*

Step 2 featured the Navy's (Factor III) Price inquiry, which reflected an evaluation of the total proposed price of bids, reviewed for completeness and reasonableness. AR 5853. The RFP also further stated that the Navy would assess pricing based on its realism, i.e., the possibility that proposed prices might be so low as to present a risk.

Step 3, "Trade-Off Process" required the Navy to evaluate which proposal presented the best value to the government, trading off the non-price and price factors. AR 5853.

The Rota RFP was also amended to include DFARS 252.222-7002, which requires that "[t]he Contractor shall comply with all [l]ocal laws, regulations, and labor union agreements governing work hours; and [l]abor regulations including collective bargaining agreements, workers' compensation, working conditions, fringe benefits, and labor standards or labor contract matters." *See* AR 6864; DFARS 252.222-7002(a)(1-2).

Also, the Navy declined to make certain adjustments to the Rota RFP in relation to the incumbent performance (by LBAS) of the contract. AR 6077. After award of the 2015 Rota contract, as a business decision, LBAS reduced the workforce at the Rota airfield, resulting in a series of disputes with employees and labor unions, including a strike and protests outside the Rota base, as well as a number of lawsuits in Spanish courts.[2] *See* AR 2665-68; AR 7966-73; *see also* AR 6076-77 (Government Past Performance Assessment of LBAS). With the 2021 Rota RFP, given the labor disputes stemming from the 2015 Rota contract, the Navy considered but then declined to add conditions to the 2021 Rota RFP concerning the "contractor's ability to navigate and resolve labor disputes." AR 6077. The Navy felt that such an evaluation factor "would be difficult to structure and objectively evaluate," and "[t]he sources of information for

---

[2] On remand, the Navy found: "… the [labor dispute] cases were ruled in favor of LBAS 69% of the time. Furthermore, for the five (5) cases ruled against LBAS, the Contracting Officer has no reason to believe that LBAS has not complied with the corrective action required by the courts. With regard to cases with individual employees, the majority of them were dismissals [which] … appear to reflect LBAS's efforts to proportionally align its workforce with the aforementioned workload reduction. It is reasonable that LBAS had to reassess the economic efficiencies of its workforce in response to the new contract's requirements, and a great portion of the litigation … was the result of workforce restructuring to meet the performance requirements of the newly competed contract … at the time. Thus, the majority of the employee dismissal cases do not seem to be arbitrary, result from ill intent, or otherwise reflect poor business ethics." AR 3139-40.

The Navy's Contracting Officer further commented, "… it was my experience with such issues in prior evaluations that labor unions and companies in the United States and abroad each have competing values that are bound to lead to disagreements, and at times, labor disputes in presiding courts. A disagreement between parties representing competing values, therefore, does not necessarily reflect poor business ethics on behalf of either party or outright disregard for each other's legal rights." *Id.*

such labor disputes can be prone to bias and ascertaining facts and determinations would require review of extensive legal documentation pertaining to complex local labor law." *Id.*

> ## ii.   The Navy's Technical Evaluation: Algese is Found Ineligible Due to an Unacceptable Technical Proposal, and LBAS is Selected for Award

Many bidders, including both LBAS and Algese, were issued "pass" ratings in fulfillment of Step 1A.  *See* AR 5943-5950.  Corresponding to Step 1B, the Spanish Ministry of Defense advised that XXXXXXXXXX, two of the bidders, were not registered business entities in Spain and required that they register to be eligible for award.  AR 6095.  However, the Ministry apparently raised no negative concerns about LBAS for the purposes of the 2021 solicitation.  AR 6095.  This is notable and relevant because Algese's allegations against LBAS in large part turn on the purported egregiousness of LBAS's conduct in reducing the workforce at Rota.  A June 2021 article reported that the Spanish Ministry of Defense was assessing whether LBAS should be disqualified in bidding to retain the contract for Rota.  *See* AR 2658.  But the Ministry of Defense effectively issued an approval for LBAS to bid to retain the contract.  AR 6095.

Also, beyond the Ministry of Defense issuing an approval to LBAS irrespective of the past labor strife at Rota, LBAS positively cited its performance on the Rota contract as a "Past Performance" reference for its bid.  AR 5158-5161.  Offerors were prompted to present "Clear statements describing whether the contract was completed on time, with a quality product conforming to the contract, without any degradation in performance or customer satisfaction."  AR 5160-61.  LBAS reported that performance had been a success, and cited an "exceptional" rating conferred by Paul Campbell, the Contracting Officer.  AR 5159.  Also, when LBAS was approved for bidding on the Rota contract, the pre-solicitation analysis of LBAS's incumbent performance in response to the labor unrest stated that "… despite the labor strikes, LBAS has never failed to support XXXXXXXXXXXXXXXXXXXXX when requested by the Government."  AR 6076.

During Step 1C, of the seven Offerors that submitted technical proposals in response to the Rota RFP, the Navy ultimately found that only two were eligible for award while five, including Algese, were found ineligible because they did not achieve an "acceptable" technical rating.  *See* AR 5965, 6111.

The Navy's finding that Algese's technical proposal was "unacceptable" stemmed specifically from two problems with Algese's staffing representations.  First, the Navy found that "Algese did not provide an example of a seven-day shift schedule with the minimum staffing requirements in accordance with PWS paragraph 4.2."  AR 5965.  Algese's Table of Contents for its proposed staffing listed a "7-day schedule."  AR 4095.  However, the pertinent page to which the Table of Contents referred did not appear to include a 7-day weekly schedule.[3]  AR 4102.

---

[3] Another bidder, XXXXXXX, submitted an employment chart which appears somewhat similar to the rejected Algese chart, and was accepted by the Navy.  AR 4683; AR 6110.  Unlike Algese's submission, XXXXXX chart is explicitly labeled as an "example of a weekly shift schedule" in several places.  AR 4683.

Second, the Navy found that while Algese's staffing submission credibly proposed XXXXX full-time employees, it "[did] not identify part-time positions within each functional area any of the aforementioned part-time positions within each functional area nor are the length of the work shifts clearly depicted." AR 5965. In a written representation, Algese mentions the planned hiring of XXX XXXX full-time employees, and also mentions "part-time employees"; however, the corresponding chart lists a "workforce grand total" of XXXX employees, seemingly omitting the possibility of part-time employees. AR 4101-02. Algese's description specifically stated:

> Algese can face unexpected occurrences such as increases or any other contingency because the assigned manpower (XXX FTE) will be composed by full and part-time employees. The presence in the workforce of the part-time personnel will increase the number of "bodies" and grant all the needed flexibility.

AR 4101. The Navy observed, "Algese total workforce is expressed as XXXXXXX and it does not identify any of the aforementioned part-time positions within each functional area nor the length of the work shifts clearly depicted." AR 5965.

After Algese and four other offerors rendered ineligible for award by "Unacceptable" Technical ratings or "Limited" Past Performance ratings, only two offerors remained in contention beyond the Technical proposal stage: LBAS and XXXXX. *See* AR 6111.

| FACTOR | LBAS | Algese | XXX | XXX | XXX | XXX | XXX |
|---|---|---|---|---|---|---|---|
| TOTAL PRICE | € 40,738,238.66 | XXXXXXX | XXXXXXX | XXXXXXXX | XXXXXXX | XXXXXXXX | XXXXXXXXX |
| TECHNICAL | Acceptable | Unacceptable | XXXXXXX | XXXXXXX | XXXXXXX | XXXXXXX | XXXXXXX |
| II PAST PERFORMANCE | Substantial | Not Evaluated | XXXXXXX | XXXXXXX | XXXXXXX | XXXXXXX | XXXXXXX |
| III PRICE | Complete and F&R | Not Evaluated | XXXXXXX | XXXXXXX | XXXXXXX | XXXXXXX | XXXXXXX |

*Id.*

As reflected in the chart above, only two of the seven offerors survived the Navy's Technical evaluation with an "Acceptable" rating: LBAS and XXXXXXX. LBAS received a "Substantial Confidence" Past Performance assessment, and quoted a price of €40.7 million. AR 6111. XXXXXXXX received a "Neutral" Past Performance assessment, and quoted a XXX million price. *Id.*

Choosing between LBAS and XXXXXXX, the Navy selected LBAS. *Id.* The Navy's award decision summary noted that the decision to select LBAS would not have changed even if Algese had, like LBAS, achieved an "Acceptable" technical rating and a "Substantial Confidence" Past Performance rating because LBAS's price was still XXX lower than that of Algese. *Id.*

**B.  The Rota RFP – The Government's Motion to Dismiss under RCFC 12(b)(1)**

The Government moves to dismiss Algese's bid protest with respect to the Rota RFP, arguing that that Algese lacks standing because it is not an "interested party."  An "interested party" is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Rex Service Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  To demonstrate a "direct economic interest," a protestor must allege (1) that a significant error was made in the procurement process and (2) that there was "a substantial chance it would have received the contract but for that error."  *Id.* at 1308.

The Government argues (1) that Algese was fundamentally ineligible for award of the Rota RFP because it failed to qualify for or complete the steps to obtain a facility security clearance ("FCL") and (2) that because Algese was disqualified at the technical evaluation stage (leaving two bidders to proceed to the award stage), it did not have been a substantial chance of being selected for award.

  **i.  The Government indicated to Algese that the DD-254 security clearance form did not need to be completed until after award**

First, the Government contends that because the Rota RFP included "handl[ing] classified shipments" and loading classified material on and off aircraft, "even if Algese's proposal had been both price competitive and technically acceptable – which [it] was not – the Navy still could not have accepted Algese's performance because Algese cannot meet the FCL requirement."  ECF No. 45 at 22; *see also* AR 7349-50.  While Algese has been providing air terminal support to the Navy in Italy for over 40 years, the Navy argues that entities not incorporated in the United States are fundamentally ineligible for award because they cannot achieve the proper security clearance status.  ECF 45 at 21 (citing 32 C.F.R. § 117.9(c)(2)(i)).

However, the Navy disqualified Algese based on a technical evaluation, not Algese's security clearance status or a related form.  Furthermore, and critically, Algese points to an exchange underlying the RFP in which Algese asked, "please clarify if the [DD-254 form] must be completed and submitted by Algese (**foreign contractor**) and, if yes, when?"  AR 5823 (emphasis added).  The Navy responded that "Contractors are not required to fill out or submit this form with their proposals. The Government will prepare and incorporate a final version of the DD Form 254 into the contract, which will include the contractor's information."  *Id.*  Also, the Navy required that "[c]ontractor shall, **within 60 days**, provide the Cognizant Security Office listed in block 6c, a copy of the **award DD-254** with any continuation pages, attachments or enclosures and the contract PWS."  AR 7350 (emphasis added).  This suggests that Form DD-254 was to be completed only following award and not earlier.

The Government argues that while the Navy disqualified Algese from award on grounds unrelated to Algese's security clearance status, this Court must still deny Algese standing

because "the proposal on its face set[] out a requirement that the protestor cannot meet."  ECF No. 45 at 22.  However, when Algese inquired about the DD-254 Form, the Navy indicated that clearance issues could be addressed later.  The Court therefore holds that because of this exchange, cited by Algese, the Navy cannot comfortably assert clearance issues or the DD-254 form issue to deny Algese standing.

### ii.  Algese's substantive arguments, if proven, would likely result in Algese finishing second behind LBAS for award of the Rota contract

Second, the Navy argues that Algese also lacks standing to challenge the Rota RFP award to LBAS because Algese did not even finish second in the procurement.  Indeed, Algese and four other contractors were disqualified at a relatively early stage because the Navy found their technical proposals unacceptable – this left only LBAS and XXXXXXX to proceed to the award stage.  On this basis, the Navy contends that Algese lacks a "direct economic interest" because, purportedly, litigation could not put Algese in a position for award (because it ranked below second in the evaluations behind XXXXXXX, the other contractor found to have an acceptable technical proposal).  *See* ECF No. 45 at 11-12 (citing *United States v. IBM Corp.*, 892 F.2d 1006, 1011-12 (Fed. Cir. 1989)).

Algese argues that XXXXXXX surviving the technical stage (and finishing second to LBAS) does not deprive Algese of standing because Algese is challenging its own unacceptability rating.  It is also the case that XXXXXXX bid was relatively weak – XXXXXXXX bid was significantly more expensive than both those of LBAS and Algese, and XXXXXXX managed only a "neutral" Past Performance rating.  AR 6111.  In other words, had the Navy found Algese's proposal technically acceptable, Algese likely "would have then been in line for award over XXXXXXX."  *See* ECF No. 46 at 11 (citing AR 6111).[4]  Algese thus frames the Navy's challenge based on standing as putting the cart before the horse: "[T]he Government cannot require a plaintiff to prove the merits of its case in order to demonstrate standing," which "would lead the court in a round-robin through the arguments on the merits in order to resolve a jurisdictional issue."  *See Caddell v. United States*, 125 Fed. Cl. 30 (2016) (citing *Textron v. United States*, 74 Fed. Cl. 277, 284-85 (2006); *see also* ECF No. 46 at 7 (citing *Harmonia Holdings Grp., LLC v. United States*, 146 Fed. Cl. 799, 811 (2020)).

The Court agrees that if Algese successfully challenges the "unacceptable" technical rating it received from the Navy, Algese's position likely would be leapfrogged past the qualifying-but-weak bid of XXXXX, and into second place as the leading alternative to LBAS.  Because such a determination turns on the merits of the case, the Court agrees that Algese is effectively being asked to prove the merits in order to demonstrate standing.  The Court therefore holds that Algese's disqualification at the technical evaluation stage, under the circumstances, does not foreclose Algese's standing to pursue a bid protest for the Rota RFP.

---

[4] Algese has provided air terminal support for the Navy for 40 years.  ECF No. 46 at 9, n.4.

### C.  The Rota RFP -- Discussion

The gravamen of Algese's argument that the 2021 Rota award to LBAS was arbitrary, capricious or irrational centrally features the labor disputes surrounding LBAS's workforce reductions during performance of the 2015 incumbent Rota contract, and related cases in Spanish courts.  More specifically, Algese presents a cluster of arguments seizing on the fact that LBAS's Past Performance submission did not reference labor unrest at the Rota airfield or related court cases.  Algese argues (1) that LBAS's omission of any reference to the labor unrest and court cases constitutes a material misrepresentation, (2) that the labor disputes should have led the Navy to downgrade LBAS, (3) that the labor disputes should have led to an adverse finding in the Navy's responsibility evaluation of LBAS, and (4) that the labor disputes mean that LBAS breached DFARS 252.22-7002, a regulation requiring "compliance" with domestic (here, Spanish) labor laws.

Separately, Algese also challenges as irrational the Navy's finding that Algese's technical proposal (staffing plan) was "unacceptable."

### i.  The Navy's evaluation of LBAS's Past Performance submission for Rota was reasonable

Algese's allegation that LBAS committed a material misrepresentation when it declined to mention labor unrest in its Past Performance submission comes up short for two main reasons. First, agency evaluations of Past Performance are entitled to overwhelming deference – "the greatest deference possible."  Second and related, the Navy was well-aware of the labor unrest, found on the merits that LBAS's performance did not suffer because of the unrest, and regarded LBAS's workforce reduction as reflecting conventional business judgment.

Agency past performance evaluations are entitled to "the greatest deference possible," – the "triple whammy of deference."  *See Bannum, Inc.*, 91 Fed. Cl. at 174; *Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004) (quoting *Overstreet Elec. Co. v. United States*, 59 Fed. Cl 99, 117 (2003)); *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909 (Fed. Cir. 2013) (agencies are afforded "broad discretion" in past performance evaluations). "[E]valuation of experience and past performance, by its very nature, is subjective . . . and an offeror's mere disagreement with an agency's evaluation judgments does not demonstrate that those judgments are unreasonable."  ECF No. 45 at 30 (citations removed).

Also, deference to agency past performance evaluations extends to the extent of the review – agencies must document their past performance evaluations, but those evaluations need not be exhaustive.  *See Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 294 (2007).

The record in this case shows that the Navy was aware of the labor unrest at Rota, and that the Navy did not regard this as impairing performance.  AR 6076 (Navy's Past Performance evaluation of LBAS).  In response to the unrest at Rota, the Navy contemplated and declined to add a "contractor's ability to navigate and resolve labor disputes" assessment component to the 2021 RFP.  AR 6077.  Weighing the appropriate deference to the Navy, which expressly

considered the labor unrest and its implications, the omission of the unrest from LBAS's Past Performance submissions cannot be construed as a material misrepresentation.

The Court likewise holds that the Navy acted rationally when it declined to change its Past Performance assessment of LBAS on remand, after assessing information about the Spanish court cases. The Navy's Contracting Officer, Jose Neto, found that the cases reflect "competing values" differing between the United States and foreign countries – the cases "do[] not necessarily reflect poor business ethics on behalf of either party or outright disregard of each other's legal rights." AR 3140. LBAS suggests that such disputed employee terminations are routine in Spain (which does not recognize at-will employment). *See* ECF No. 44 at 20 (citing AR 3064). The Court agrees with the Navy and LBAS. Given that such labor dispute cases reflect routine process, and that the Navy regarded LBAS's staff reductions as business judgment (AR 6076 ("a decrease in contract workload requirements from the predecessor contract")), LBAS not discussing the labor unrest and Spanish court cases on its Past Performance submission does not readily translate into a material misrepresentation.

Furthermore, even beyond this, irrespective of the ostensible "competing values" of Spain and the United States as reflected in LBAS's labor practices, the Spanish Ministry of Defense assessed whether to disqualify LBAS from bidding (see AR 2658), and then approved LBAS's eligibility. AR 6095. This yet further cuts against construing LBAS's omission of the labor unrest and court cases as a material misrepresentation.

Algese tries to support its argument by pointing out that offerors were asked to submit "Clear statements describing whether the contract was completed on time, with a quality product conforming to the contract, without any degradation in performance or customer satisfaction." AR 5160-61. According to Algese, this language cannot be reconciled with LBAS declining to mention the labor unrest. However, as noted above, the record shows that the Navy assessed the impact of the labor unrest, considered the Spanish labor cases on remand, and declined to change its position concerning LBAS's Past Performance submission.

The Navy's evaluation of LBAS's Past Performance submission was reasonable; LBAS's non-inclusion of the labor strife at Rota and the Spanish court cases cannot be regarded as a material misrepresentation, let alone one which overrides the overwhelming deference owed to agency Past Performance evaluations.

### ii. The Navy rationally decided not to downgrade LBAS's "Substantial Confidence" Past Performance rating because of the Spanish court cases

Algese alleges that the Navy's remand decision – not to downgrade LBAS's Past Performance rating – was an irrational "post hoc rationalization" because, purportedly, the scope of remand assessment was "rigidly narrow" and "bounded by the Lacave Declaration" so that it did not reflect the true impact of the labor strife at Rota.

The Court finds this argument difficult to accept. As reviewed above, the Navy was aware of the labor strife at Rota, assessed that it did not hurt LBAS's performance, and further

decided that labor relations should not be incorporated into the 2021 Rota RFP.  AR 6077.
Accordingly, the Government observes:

> The technical evaluation of "past performance" included considering the
> extent to which the offeror: "me[t] technical requirements; me[t] schedule
> requirements; control[ed] contract costs; and [] demonstrated systemic
> improvement actions taken to resolve past problems." These criteria,
> understandably, focus on how well the offeror actually performed on past
> contracts, and not how tumultuous its labor practices were during the
> performance of those contracts. Thus, on remand, the contracting officers
> agreed that any labor disputes or litigation that Louis Berger had during
> the course of its past performance were not "directly tied" to these criteria,
> and that evaluation of such disputes was not called for in the solicitation.
> ECF No. 45 at 31 (citations omitted).

The Court also strongly agrees with LBAS's response to Algese's argument about the
purportedly superficial scope of the remand decision:

> This argument is nonsense. Algese filed a Complaint arguing that the
> Navy should not have awarded LBAS the Naples and Rota contracts
> because of "multiple Spanish court decisions" purportedly establishing
> that LBAS violated Spanish labor law. So on remand, the Navy engaged
> their inhouse Spanish legal expert, Tomas Lacave, to evaluate the
> decisions. Mr. Lacave compiled a declaration that provided a high-level
> overview of Spain's labor laws and outlined the four cases Algese
> identified plus 12 additional cases. The COs then incorporated Mr.
> Lacave's declaration into their existing evaluations of LBAS, which
> included LBAS's record of exceptional performance in Rota and similar
> ATGHS contracts, and concluded that the information in Mr. Lacave's
> declaration did not alter their award decisions.  ECF No. 44 at 36 (citing
> AR 9198-9207).

As observed by LBAS, Algese seems to be implying that the remand decisions narrowly
evaluated the Lacave Declaration to the exclusion of their existing evaluations, but the remand
decisions instead seem to reflect existing evaluations with the addition of the Lacave declaration.

Algese cites caselaw for the proposition that "the Court appropriately is to consider 'the
whole record before the agency."  ECF No. 41-1 at 23 (citing *Syncon, LLC v. United States*, 154
Fed. Cl. 442, 452 (2021)).  Indeed, the Court recognizes that evaluating the "whole record before
the agency" – and also weighing the deference owed to the Navy – supports the Government's
position and not Algese's.

The Court holds that the Navy's decision not to downgrade LBAS's "Substantial
Confidence" Past Performance assessment was rational.

### iii. The Navy rationally determined that LBAS was a responsible contractor

Algese also argues under FAR (Federal Acquisition Regulation) 9-104-1 that the Navy's finding that LBAS was a responsible offeror was irrational in light of the Rota labor disputes and Spanish court cases.

Under FAR 9.104-1(a-d), to be determined responsible, a contractor must (a) have adequate financial resources to perform a contract, (b) be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments, (c) have a satisfactory performance record, and (d) have a satisfactory record of integrity and business ethics.  FAR 9.104-1.

Agency responsibility decisions "are largely a matter of judgment, and contracting officers are normally entitled to considerable discretion and deference in such matters.  When such decisions have a rational basis and are supported by the record, they will be upheld." *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002), *see also Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 415 (2013) (responsibility determination challenges "face[] a high hurdle.").

First, Algese argues under FAR 9.104-1(a) that LBAS's bid triggers financial responsibility concerns because LBAS faces purported financial liabilities from the Rota-related Spanish court cases – according to unions in Europe, LBAS "owes potentially 1.5 million Euros … due to labor violations."  ECF No. 41-1 at 28-29.  Second, Algese argues under FAR 9.104-1(b) that LBAS cannot be considered responsible because of alleged "severe delays in performance at the Rota facility."  ECF No. 41-1 at 29.  Third, Algese argues under FAR 9.104-1(c) that Rota had a substandard performance record because of the labor disputes at Rota.  *Id.* Fourth and finally, Algese argues under FAR 9.104-1(d) that LBAS does not have a satisfactory record of integrity and business ethics because of the Rota labor strife and a past legal dispute. *Id.* at 30.

The Navy's finding that LBAS was a responsible contractor – owed significant deference – is plainly rational.  LBAS's Past Performance submission states that the CO for the 2015 Rota contract found LBAS's performance "exceptional."  AR 5159.  As noted above, the Navy knew about the Rota labor disputes and assessed that operations at Rota were not harmed as a result. *See* AR 6076*.*  Furthermore, the Navy also recognized that LBAS's reduction of the workforce as a "restructuring" which was a business judgment response to "a decrease in contract workload requirements from the predecessor contract."  *Id.*

Algese also raises a past bid protest case (a protest of the award to LBAS in 2015) in which the Court of Federal Claims initially sustained a bid protest because of (undeclared) criminal proceedings against LBAS's parent company and other Louis Berger entities – the Court remanded the protest to the Navy for a new responsibility determination, the Navy reaffirmed its determination irrespective of the criminal proceedings, and the court deferred.

*Algese 2 s.c.a.r.l. v. United States*, 127 Fed Cl. 497, 499-500, 502-05 (2016).  Similarly, here, Algese argues that LBAS should not be found responsible because of a failure to disclose the labor strife and court cases.  But as noted above, the Navy recognized and explicitly considered the labor unrest.  AR 6076-77.

       The Court holds that the Navy had a rational basis for determining that LBAS was a responsible contractor.

### iv.  The Rota Contracting Officer rationally found that LBAS did not violate DFARS 252.222-7002

       DFARS 252.222-7002, "Compliance with Local Labor Laws (Overseas)," included in the Rota RFP, requires "compl[iance] with all … [l]ocal laws, regulations and labor union agreements governing work hours."  DFARS 252.222-7002.  Algese argues that LBAS failed to comply with DFARS 252.222-7002, and that the Navy improperly waived this compliance requirement for LBAS, prejudicing Algese.

       Algese's arguments based on DFARS 252.222-7002 may be subdivided into policy and textual prongs.  On a policy basis, Algese alleges that LBAS's workforce reductions in performance of the incumbent Rota contract reflect a plan to reduce costs by "breaking" the Spanish unionized workforce, conflicting with DFARS 252.222-7002.  Algese alleges that this "runs contrary to the Biden administration's policy favoring continuity of workers," as purportedly reflected in Executive Order 14055 (Nov. 18, 2021), which post-dates LBAS's workforce reductions at Rota.

       However, the Navy regarded LBAS's workforce reductions as a "restructuring" which was a business judgment response to "a decrease in contract workload requirements from the predecessor contract."  AR 6076.  Furthermore, even if Executive Order 14055 did apply retroactively to LBAS's workforce reductions, it seems to support those reductions.  The Order plainly states:

> The contractor and its subcontractors shall determine the number of employees necessary for efficient performance of this contract and **may elect to employ** more or **fewer employees than the predecessor contractor employed in connection with performance of the work solely on the basis of that determination**.

EO 14055 at 3(a) (emphasis added).

       Textually, Algese argues for a strict reading of the word "comply" under DFARS 252.222-7002, effectively contending that the Spanish court case rulings against LBAS constitute non-compliance with labor laws.  The Navy on remand took the position that the five adverse judgments in Spanish court were part of the routine employment dispute process.  Jose Neto, the Rota Contracting Officer, found that the Spanish court cases reflect "competing

values" differing between the United States and foreign countries – and that the judgments "do[]
not necessarily reflect poor business ethics on behalf of either party or outright disregard of each
other's legal rights."  AR 3140.  Neto further stated that there is "no reason to believe that LBAS
has not complied with the corrective action required by the Courts."  AR 3139.

In the alternative, Algese also argues that even if the Navy's reading of "comply" is
found reasonable, Algese's definition is also reasonable.  Therefore, purportedly, these conflicted
reasonable constructions of DFARS 252.222-7002 amount to a patent ambiguity, which Algese
alleges must be resolved by clarifying the Navy's interpretation and soliciting revised proposals.

The Court agrees with the Navy and LBAS that such court cases reflect routine process
inherent in employment disputes rather than poor business ethics and disregard for legal rights.
*See* AR 3140.  Furthermore, overarching this finding is the fact that the Spanish Ministry of
Defense contemplated whether to disqualify LBAS from bidding (*see* AR 2658), and then issued
an approval.  AR 6095.  This seems to suggest, likewise, that the Court decision against LBAS
reflecting routine process (followed by compliance) rather than disregard for legal rights or a
"violation."

The Court holds that the Navy was rational to find that the Rota-related Spanish court
cases did not constitute a violation of DFARS 252.222-7002.

> **v.  The Navy's evaluation of Algese's staffing plan was rational; and even if the
> Navy had not disqualified Algese because of its staffing plan, LBAS still would
> have been selected over Algese for the 2021 Rota award**

The Navy found Algese's technical proposal Unacceptable and declined to evaluate
Algese further.  Algese argues that this finding was irrational, and also argues in the alternative
that the Navy acted irrationally in not raising the basis of the "unacceptable" finding during the
bidding process so that Algese could respond.

As noted above, the Court's review of "matters requiring technical judgment" is "highly
deferential."  *See, e.g., Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 740 (2007)
("Agencies are entitled to considerable discretion and deference in matters requiring exercise of
technical judgment.").

As also noted above, the Navy ascribed an "Unacceptable" technical rating to Algese for
two reasons.  First, the Navy found that Algese did not provide an example of a seven-day shift
schedule with minimum staffing requirements, as requested.  *See* AR 5965.  Algese listed a
"Seven Day Shift Schedule" in its table of contents, but the page to which this entry
corresponded does not appear to have included a 7-day schedule.  *See* AR 4095.  Second, while
the solicitation sought submissions identifying part-time positions (and the length of work
shifts), Algese proposed XXXX full-time employees, with a chart listing a "workforce grand
total" of XXXX seemingly omitting part-time employees, and omitting details about the length
of shifts.  AR 4101-02; AR 5965.

Algese argues that in fact they did provide a seven-day shift schedule, and that
XXXXXXX made a similar technical submission which was not found "Unacceptable" by the

Navy.  The Court holds that the Navy was rational to regard Algese's submission as not including a seven-day shift schedule, and distinct from XXXXXXX; for example, unlike Algese's submission, XXXXXXX chart is explicitly labeled as an "example of a weekly shift schedule."  *See* AR 4683.

Algese also argues that even if its submission did not specify part-time employees and information about their shifts, the listing of XXXXXXX full-time employees would have been enough to perform the contract.  *See* ECF No. 41-1 at 43.  However, the fact remains that as the Navy observed, "Algese's total workforce is expressed as XXXXX FTEs and it does not identify any of the aforementioned part-time positions within each functional area nor the length of the work shifts clearly depicted."  AR 5965.

Overarching these two substantive arguments, Algese additionally contends that in response to these problems in Algese's technical proposal, the Navy should have opened discussions or sought clarification rather than simply issuing an "Unacceptable" technical rating disqualifying Algese.  *See* ECF No. 41-1 at 44-45.  Algese points out that clarifications are "limited exchanges, between the government and offerors that may occur when award without discussions is contemplated" and provide offerors with "the opportunity to clarify certain aspects of proposals," including "minor or clerical errors."  *Id.* (citing FAR 15.306(a)(1)-(2)).  Agencies have discretion to decide whether to seek clarification and may be found to have abused that discretion.  *See, e.g.*, *Level 3 Commc'ns, LLC v. United States*, 129 Fed. Cl. 487 (2016); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 511-13 (2013).

This Court declines to find the Navy's disinclination to open discussions or seek clarifications on Algese's bid amounts to an abuse of discretion by the Navy.  As the record reflects, even if Algese had been issued an "Acceptable" technical rating, this would have rendered LBAS and Algese equivalent (in their ratings), except that Algese's bid was XXXXXXXXX more expensive.  AR 6110.  Therefore, LBAS would still have been selected for award (even had Algese remained in contention) because then the Navy would have been faced with two contractors with directly equivalent technical ratings, where one, LBAS, offered a substantially lower price.  *Id.*

The Court holds that the Navy had a rational basis to find Algese's technical proposal "Unacceptable."  The Court further holds that under the circumstances, the Navy did not abuse its discretion by declining to open discussions or request a clarification from Algese.

### D.  The Naples RFP – Background and Award to LBAS

The Naples RFP established that award would be decided based on three factors: (1) Technical Capability, (2) Past Performance, and (3) Price, to be assessed on a Best Value basis – a combination of pass/fail ratings and a tradeoff approach.  AR 758.  In other words, the Government was awarding the contract to the bid providing the "greatest overall benefit(s) in response to the requirement."  *Id.*  This left open the possibility that the lowest bid might not be selected for award if a higher-priced and higher-rated bid was determined to be most beneficial to the Government.  *Id.*

Factor 1, Technical Capability, was to be "evaluated on an Acceptable/Unacceptable basis." *Id.* A proposal determined not to meet the minimum requirements of the RFP would be found Unacceptable. *Id.* The Technical Capability assessment comprised three subfactors: (i) Performance Work Statement ("PWS") Capability Acknowledgment, (ii) Staffing and (iii) Implementation. *Id.*

The PWS subfactor of Technical Capability directed offerors to submit a signed acknowledgment letter representing that the Offeror is capable of performing work requirements. Staffing subfactor assessments required offerors to demonstrate their planned staffing – including the workforce levels and skills necessary to perform the work, an organizational chart identifying on-site management and personnel, and other details corresponding to the required minimum staffing requirements. AR 759. The Implementation subfactor required Offerors to demonstrate their capacity to establish full operations by the designated performance start date. *Id.*

Factor 2, Past Performance, enabled Offerors to submit up to three Past Performance assessments. AR 755. The RFP further specified that "[i]f a joint venture or a teaming arrangement of any sort is contemplated, there should be at least one reference from each party with a total not exceeding overall references. *Id.* The RFP stipulated that Past Performance assessment would reflect Offerors' overall record of "recency, relevancy, and quality . . . ." *Id.* Relevancy ratings ranged from Limited to Neutral, to Satisfactory, to Very Relevant. AR 759. Past Performance Confidence assessment ratings ranged from No Confidence, Limited Confidence, Neutral Confidence, Satisfactory Confidence and Substantial Confidence. AR 760.

Factor 3, Price, required the Navy to evaluate proposed prices for completeness and reasonableness.

The Naples RFP was also amended to include Defense Federal Acquisition Regulations Supplement ("DFARS") 252.222-7002, which states, "The Contractor shall comply with all [l]ocal laws, regulations, and labor union agreements governing work hours; and [l]abor regulations including collective bargaining agreements, workers' compensation, working conditions, fringe benefits, and labor standards or labor contract matters." AR 657; DFARS 252.222-7002 (a)(1-2).

While four contractors competed for the Naples RFP, only LBAS and Algese submitted bids which the Navy found acceptable. AR 2009. Both contractors received matching "acceptable" Technical Capability ratings. AR 1998. Likewise, both contractors received "Substantial Confidence" Past Performance ratings. *Id.* However, the two contractors were far apart in price: Algese bid XXXXXXXXX and LBAS bid $14,781,422.17. AR 1998-99. In other words, LBAS's bid was more than XXXXXXX less expensive, with ratings matching those of Algese. The Navy determined that LBAS offered the best value and awarded it the contract. AR 2031. This leaves Algese in the position, as protestor, of trying to argue in part that LBAS's ratings should have been inferior to Algese's, which might have justified award to Algese despite its higher bid price.

### E.  The Naples RFP – Discussion

Because LBAS's successful bid for the Naples contract included a Past Performance reference to its prior 2015 incumbent performance of the Rota contract (which did not mention labor disputes at Rota or related Spanish court cases), Algese's challenge to LBAS winning the Naples contract includes many of the same arguments made in relation to the Rota RFP, *supra*. Accordingly, Algese alleges (1) that LBAS's Naples award must be overturned because, purportedly, LBAS's incumbent Rota Past Performance submission reflects a material misrepresentation, (2) that the Navy should have downgraded LBAS on remand because the Rota Past Performance submission did not mention labor strife, (3) that LBAS should have been penalized in the Navy's LBAS Naples responsibility determination because, purportedly, the labor strife at Rota will be repeated by LBAS at Naples, and (4) that LBAS's performance at Rota violated DFARS 252.222-7002, and that this purported violation will be repeated by LBAS's operations at Naples.

Separately, Algese makes several arguments independent of LBAS's Rota Past Performance submission.  Algese alleges that LBAS violated a condition of the Naples RFP by listing an affiliate involved with performance (a "teaming arrangement"), Louis Berger Italia S.r.l., but without submitting a Past Performance reference for this affiliate.  Algese also alleges that LBAS's staffing submissions conflicted with the requirements of the solicitation and should have led the Navy not to award the Naples contract to LBAS.

### i.  The Navy's evaluation of LBAS's Past Performance submission for the Naples RFP was reasonable

For its protest of the award of the Naples RFP to LBAS, Algese presents a series of arguments relating to the labor disputes and Spanish court cases stemming from LBAS's incumbent performance of the Rota contract.

First, Algese argues that the labor strife at Rota and related Spanish court cases required the Navy to find that LBAS's Rota Past Performance submission (for the Naples RFP) – which did not mention the labor unrest or Spanish court cases – reflected a material misrepresentation or should have led the Navy to downgrade LBAS.

As noted above, agency assessments of Past Performance submissions are due overwhelming deference.  Here, the Navy knew about the labor unrest and found that it did not impair LBAS's "exceptional" performance at Rota.  AR 5159; 6076.  The Navy also contemplated and then declined to add a labor relations component to the 2021 Rota RFP.  AR 6077.  On remand, the Navy considered the court cases and regarded these as reflecting "competing [national] values," rather than a reflection of poor business ethics or disregard for legal rights.  *See* AR 3140 (Rota CO Jose Neto); AR 3143-46 (Naples CO Danielle Lafferty). The Court agrees with LBAS that the Spanish court cases appear to reflect customary legal process for employment disputes in Spain.  ECF No. 44 at 20 (citing AR 3064).  On top of this, Spain's Ministry of Defense reportedly assessed disqualifying LBAS because of the labor disputes (*see* AR 2658) and then in fact approved LBAS.  AR 6095.  The Court holds that the Navy's evaluation of LBAS's Naples Past Performance submission was rational – the Navy was

19

rational to find that the Rota Past Performance submission did not reflect a material misrepresentation.  The Court further holds that the Navy's decision not to downgrade LBAS after reviewing the Spanish Court cases (on remand) was rational.

Second, Algese likewise invokes the labor unrest at Rota to question the Navy's responsibility determination for LBAS with respect to the Naples RFP, aligned against heavy deference for agency responsibility determinations.  When such decisions have a rational basis and are supported by the record, they will be upheld."  *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002), *see also Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 415 (2013) (responsibility determination challenges "face[] a high hurdle.").

Algese contends that unrest stemming from LBAS workforce reductions at Rota projects likely similar unrest at Naples – Italian unions have threatened to strike against LBAS.  AR 9215.  However, as noted above, the Court holds that the Rota labor unrest and related Court cases do not impugn LBAS's financial responsibility (FAR 9.104-1(a)), ability to perform (FAR 9.104-1(b)), performance record (FAR 9.104-1(c)), or record of integrity and business ethics (FAR 9.104-1(d)).

Algese makes two further arguments critiquing LBAS's responsibility determination regarding LBAS's considerable track record for performing air terminal and ground handling services.  Algese argues that under FAR 9.104-1(e) that LBAS does not possess the operational controls and technical skills to perform because of LBAS's purported failure to engage with Italian labor unions at the Naples facility, and that the Naples Contracting Officer failed to evaluate this risk.  AR 9209-10.  Algese also argues that the Naples Contracting Officer transgressively relied on LBAS's parent company, WSP Global, to reach a responsibility determination.  *See* AR 963-64; AR 3145.  Upon remand, the Naples Contracting Officer conceded that WSP was cited as LBAS's parent company in the context of reaching a responsibility determination, but also stated that "other information within the responsibility determination … fully substantia[d] LBAS's [financial] responsibility."  AR 3145.  Indeed, LBAS has provided air terminal and ground handling services at many other airbases around the world, including some which are much larger than Naples.  *See* AR 1232; 1239; 1266.  The Court holds that the Navy's responsibility determination for LBAS with respect to the Naples RFP was rational.

Third, as noted above, the Court also holds that the Navy rationally found that DFARS 252.222-7002 was not "violated" by the labor unrest at Rota or the Spanish court cases.  The Navy regarded the workforce reductions at Rota as a "restructuring" which was a business judgment response to "a decrease in contract workload requirements from the predecessor contract."  AR 6076.  The Contracting Officers for both Naples and Rota regarded the resulting court cases as routine process, with which LBAS complied; and on top of this, the Spanish Ministry of Defense contemplated disqualifying LBAS from bidding (see AR 2658) and then issued an approval.  AR 6095.  The Court holds that the Navy was rational to not find a past "violation" of DFARS 252.222-7002 at Rota in the first place and was therefore also rational not to project such an ostensible violation onto LBAS's *future* performance of the Naples contract.

### ii.  The Navy Reasonably found that Louis Berger Was Not Required to Submit a Past Performance Reference for Its Italian Subsidiary

Algese argues that LBAS breached the terms of the Naples solicitation for failing to submit a Past Performance reference for a subsidiary because the Naples RFP stated: "If a joint venture or a teaming arrangement of **any sort** is contemplated, there **should be** at least one reference from each part with a total not exceeding overall references." AR 755 (emphasis added).

Algese points to a letter submitted by LBAS introducing its technical capabilities, which stated:

> Louis Berger **and our registered Italian entity Louis Berger Italia, S.r.l.** (Louis Berger) is pleased to present NAVSUP FLC Sigonella our proposal to perform Air Terminal and Ground Handling Services (ATGHS) at Naval Support Activity Naples (Military) Air Terminal Capodichino, Naples, Italy.

AR 1768 (emphasis added).  Algese also argues that LBAS's use of pronouns such as "we" and "our" elsewhere in its submissions further supports the idea that LBAS was engaged in a teaming arrangement with Louis Berger Italia, S.r.l.  ECF No. 41-1 at 33-34.

The Navy understood that Louis Berger Italia, S.r.l. was a subsidiary of LBAS, and that the subsidiary was being used only to facilitate LBAS's business in Italy.  AR 9205.  The Navy's finding is due significant deference.  Beyond this, LBAS argues that likewise, Algese also mentioned subsidiary or "sister" entities, GH Napoli SpA and Alisud SpA.  *See* AR 934.  LBAS additionally argues that in any case, submission (or not) of past performance references for subsidiaries was discretionary (not compulsory under the RFP) because the RFP states that bidders "should" (not "shall" or "must") submit Past Performance references.

The Court holds that the Navy rationally found that LBAS not submitting a Past Performance reference for Louis Berger Italia, S.r.l. did not violate the terms of the Naples RFP.

### iii.  The Navy's evaluation of LBAS's Proposed Staffing was Rational and Consistent with the Solicitation

Algese makes three arguments challenging the Navy's technical assessment of LBAS's staffing plan.  Algese alleges (1) that the Navy ignored performance risks associated with LBAS's ostensible planned workforce reductions at Naples, (2) that LBAS's staffing plan – and the number of Full Time Employees (FTE's) advertised – was materially non-compliant with the required level of effort to perform the contract and (3) that LBAS failed to show that it could meet the minimum staffing requirements for two key positions necessary to managing the Naples airfield.

First, Algese argues that because LBAS's staffing plan for Naples projects a XXX reduction of the workforce, the Navy's positive evaluation of LBAS's ability to perform was irrational.  *See* ECF No. 41-1 at 36.  In other words, the Naples Contracting Officer purportedly

failed to anticipatorily weigh the risk of a drop in performance due to future labor strife at the Naples air base. *Id.* at 37. As with the Rota arguments, Algese also argues that LBAS's intended workforce reductions are "at odds with U.S. laws and traditions, a violation of U.S. treaty obligations, and directly contrary to the Biden administration's contracting policies." *Id.*

Algese's position is a stretch given that the Navy's technical evaluations are due significant deference. *See E.W. Bliss Co.*, 77 F.3d at 449 (Fed. Cir. 1996) ("[T]echnical ratings ... involve discretionary determinations of procurement officials that a court will not second guess."). Beyond this, the Naples RFP did not require bidders to retain the same level of staffing as under the incumbent contract – it required offerors to "demonstrate adequate staffing and sufficient management to support the requirements identified in the PWS …". *See* AR 3245. Indeed, the Navy found that LBAS's proposal reflected "a clear understanding of PWS performance requirements." AR 1189, 2027. The Navy's Contracting Officer ultimately found that there is "no reason to believe that LBAS will not be able to perform at this price and with fewer FTE's than Algese proposed to use." *See* AR 2025. Algese predicts LBAS's workforce reductions "will almost certainly encounter the same problems in Naples." AR 41-1 at 37. However, as reviewed above, the Navy regarded LBAS's reductions at Rota as reasonable, found that performance was not impeded by the labor unrest, and considered and then rejected adding a "labor relations" condition to the successor Rota RFP. *See* AR 6076-77. In addition, Algese's reliance on EO 14055 seems questionable given that the Order explicitly directs that contractors "may elect to employ more or fewer employees than the predecessor contractor … in connection with the performance of work." EO 14055 at 3(a). Weighing the required deference, the Court holds that the Navy rationally found that LBAS's staffing plan did not threaten operations at Naples based on the possibility of labor strife.

Second, Algese argues that the Navy "ignored clear inconsistencies" in LBAS's staffing plan for the Naples Contract. Algese accurately points to a spot in LBAS's staffing submission where "part time" employers are labeled "FTE" ("full time employee"). *See* AR 1769. However, LBAS's full "organizational structure" chart *does* distinguish between full time and part-time employees and lists XXX total employees. AR 1772. The Navy was satisfied with LBAS's staffing plan and, reflecting the "organizational structure" chart, understood that that there would be XXX total employees – XXX part-time and XXX full-time. AR 1189. In other words, Algese's argument mainly focuses on an oversight in one sub-area of LBAS's staffing plan submission (*see* AR 1769) which did not confuse the Navy, or prevent the Navy from understanding LBAS's planned balance between full and part-time employees. As noted above, the Navy's technical ratings are due significant deference. The Court holds that the "inconsistencies" identified in LBAS's staffing plan by Algese cannot support a finding that the Navy's assessment was arbitrary, capricious or irrational.

Third, Algese argues that LBAS's proposed staffing submission was materially noncompliant with the Naples RFP. The RFP directed offerors in part to submit (1) "a signed Acknowledgment letter stating [that] the offeror is capable of performing all PWS requirements" (AR 3241) and (2) "a plan which **describes** the proposed manning level and skills mix necessary to ensure [that] all required personnel resources are provided to successfully accomplish all performance requirements on the start date of the performance period." *Id* (emphasis added).

The RFP also specified that a Station Manager (or Alternate Station Manager) needed to be available 24 hours per day, seven days per week, 365 days per year. *See, e.g.*, AR 687.

LBAS's proposed staffing submission in two spots appears to list one Station Manager available for 8-hour shifts and one Alternate Station Manager also available for 8-hour shifts. AR 1769, 1772. Algese thereby argues LBAS failed to comply with the RFP by not explicitly listing Station Managers covering a full 24-hour workday. *See* ECF No. 41-1 at 39. Indeed, if strictly construed as a comprehensive staffing plan, LBAS's submission can be read as leaving a gap of 8 hours per day when, purportedly, no Station Manager would be available. In other words, Algese's argument hinges on construing the RFP request for a staffing plan "which describes … manning levels" as a strict requirement mandating comprehensive, explicit submissions accounting for 24-hour per day staffing. But the Navy's evaluation of LBAS's staffing submission approvingly stated, "LBAS indicated a staffing capacity and stated intent to employ part-time personnel for additional hours to cover requirements to meet minimum staffing requirements." AR 1190.

In alignment with the Navy's evaluation of LBAS's staffing plan (AR 1190), the Government contends that the solicitation did not require offerors to comprehensively list staffing personnel. Rather, according to the Government, the RFP required bidders to submit plans "which [merely] describe[]" staffing levels (AR 3241), and led bidders to certify their staffing plans through an acknowledgement letter. *See* AR 1022 (LBAS acknowledgement letter); AR 3241. Weighing the heavy deference afforded to agency technical assessments, the Court holds that the Navy was rational to not reject LBAS's technical proposal for listing only two 8-hour Staffing Managers.

## III.    Conclusion

For the reasons set forth above, the Court **DENIES** Defendant's Motion to Dismiss with respect to the Rota RFP. The Court further **DENIES** Plaintiff's Motion for Judgment on the Administrative Record. The Court **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record. The Court further **GRANTS** Defendant-Intervenor LBAS's Cross Motion for Judgment on the Administrative Record.

The parties are directed to file redactions within **ten (10) days** of the date of this Opinion and Order.

**IT IS SO ORDERED.**

s/ Edward J. Damich<br>
EDWARD J. DAMICH<br>
Senior Judge